COURT OF APPEALS

| | |
|---|---|
| PEOPLE OF THE STATE OF MICHIGAN, | UNPUBLISHED |
| | January 20, 2015 |
| Plaintiff-Appellee, | |
| v | No. 318508 |
| | Wayne Circuit Court |
| ANTOINE LAMONT WILSON, | LC No. 13-003664-FC |
| Defendant-Appellant. | |

Before: BECKERING, P.J., and JANSEN and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of first-degree murder, MCL 750.316(1)(a), felon in possession of a firearm, MCL 750.224f, two counts of felonious assault, MCL 750.82, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to life imprisonment without parole for his first-degree murder conviction, two to five years' imprisonment for his felon in possession of a firearm conviction, two to four years' imprisonment for each felonious assault conviction, and two years' imprisonment for his felony-firearm conviction. We affirm.

I. PERTINENT FACTS AND PROCEDURAL HISTORY

At approximately 11:00 a.m. or 11:30 a.m. on April 6, 2013, defendant traveled by cab to 3914 Garvin Street, Detroit, Michigan, where the victim, Ajena Peavy, lived. He had a loaded revolver in his possession. According to defendant, he and Peavy had been in a committed relationship for approximately two years and planned to marry in the summer of 2014. The previous night, defendant had repeatedly called and texted Peavy—acknowledging on cross-examination that he was not surprised to hear that he had sent her 64 text messages and had called her 59 times—in order to "check[] in on her[,] see[] where she was at, who she was with [sic] type of thing." At approximately 10:00 a.m. the next morning, Peavy called defendant and "was acting . . . different than she usually does[,] from cussing me out about calling her all the [sic] night before." After defendant spoke with Peavy, he texted Ladonna Hicks, Peavy's mother, to "check [Peavy's] story." In response to defendant's text message, Hicks replied that Peavy had spent the night at home; however, Peavy had actually left the house with her friend, Jeremiah, around 1:00 a.m. After this communication with Hicks, defendant decided to go to Hicks's residence, where Peavy also lived.

When defendant arrived, he told Hicks that Peavy had told him to meet her at the house. Peavy was not at home at the time, so Hicks invited defendant inside and called Peavy to confirm whether defendant was supposed to meet her there. Peavy returned to the house several minutes later and entered the living room, where defendant was waiting. After a brief conversation, defendant and Peavy went onto the front porch. Hicks estimated that defendant and Peavy remained on the porch for five to seven minutes. Jakhari Culver, Peavy's brother, who was home at the time, could hear them talking, calmly at first. Culver testified:

> So then afterwards my sister just -- you know, she told him that, you know, I'm not going through this anymore. Then she tried to go in the house, and then the next thing you know, he pulled a gun out, and she screamed. She said, "Momma." She said, "Momma." [sic] And then she put her hands up[,] trying to block the bullet that he had shot. And then she had -- he had took [sic] off three of her fingers. And then me and my mom got to the door. We tried to help her, but then he pointed the gun at the door. And I just froze[,] and I stood there, but then my mom pulled me back and closed the door. And that's when I heard more gunshots. And [when we went outside,] we saw a bullet in her [stomach area], and [there] was one in her face."

Hicks also testified that she heard Peavy say, "Momma," and then she heard gunshots as she went to the front door. When Hicks reached the door, Peavy was lying on the porch, and defendant was pointing the gun downward toward Peavy. When Hicks tried to assist Peavy, defendant pointed the gun at Hicks, while Culver and Hicks's grandson were standing in the living room behind her. Hicks then stepped back and began closing the door. Hicks testified that after shooting Peavy one more time, defendant "walked off the porch like nothing [had] happened."

According to defendant's testimony, Peavy acknowledged, while he and Peavy were talking on the porch, that the man whom she was with the night before was her new boyfriend and that she did not want to be with defendant anymore. Defendant explained that "basically [he] lost it and pulled out [his] gun and shot" "when [he] heard the news of just suddenly being let go like that" in light of "all [he] had been through." He had learned approximately one week before the incident that Peavy had had a miscarriage after she had become pregnant while living with him, and he was notified a few days prior to the incident that his youngest son was sexually and physically abused by the boyfriend of the son's mother. Defendant stated that "[he] really wasn't in the right state of mind to know what [the bullet] was going to do" when he pulled the trigger on the gun, stating that he had never shot a gun prior to the incident. Defendant testified that he had no intention of shooting Peavy when he came to her house that morning, explaining that he was carrying the gun—even though he was aware that it was illegal for him to do so due to his previous felony conviction—for his safety in light of the fact that he had recently been robbed.

Additionally, defendant testified that he did not remember how many times he shot Peavy, but that he did remember that she was standing up when he shot her. Defendant also did not remember pointing the gun directly at Hicks before he continued to shoot Peavy. Defendant testified that, after he shot Peavy, "[he] stood there for a second and tried to check her pulse, and once [he saw] that she wasn't there anymore, [he] just basically panicked and walked off." He

did not remember where the gun was when he walked away because he "was kind of . . . still in shock and dazed from the whole thing." The testimony of a neighbor, who lived two houses down from the scene of the crime, confirmed that an African-American male who had fired a gun at 3914 Garvin Street walked past his house and down the street after the shooting while openly carrying a gun in his hand, although the neighbor could not identify defendant at trial.

On March 27, 2014, after defendant filed his claim of appeal following his convictions and sentencing, defendant filed a motion with this Court to remand this matter to the trial court under MCR 7.211(C)(1). Defendant argued that an evidentiary hearing was required to determine whether he had been denied the effective assistance of counsel, based on defense counsel's failed to ensure that defendant realized he could no longer negotiate a plea offer after the final pretrial conference. This Court granted defendant's motion to remand, stating that defendant "may file a motion for a new trial in the trial court based on ineffective assistance of counsel," and "[t]he trial court shall conduct an evidentiary hearing and rule on the motion."[1] On May 20, 2014, defendant filed a motion for a new trial in the trial court. On July 11, 2014, the trial court held a *Ginther*[2] hearing and denied defendant's motion for a new trial. This appeal followed.

II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that defense counsel provided ineffective assistance of counsel by failing to make it clear to defendant that he was precluded from accepting a plea offer after the date of the final pretrial conference, by failing to participate in additional settlement negotiations with the prosecution, and by failing to request an adjournment of the final conference in order to ensure that defendant understood and appreciated the significant consequences of rejecting a plea offer. We disagree.

This Court reviews a trial court's decision to grant or deny a defendant's motion for a new trial for an abuse of discretion, which "occurs when the trial court's decision is outside the range of principled outcomes." *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012) (internal quotation marks and citation omitted). "Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. [This Court] review[s] the trial court's findings of fact at a *Ginther* hearing for clear error, and review[s] questions of constitutional law de novo." *Id.* (internal quotation marks and citation omitted). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008) (internal quotation marks and citation omitted).

---

[1] *People v Wilson*, unpublished order of the Court of Appeals, entered May 14, 2014 (Docket No. 318508).

[2] *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973).

The right to effective assistance of counsel during a criminal trial is guaranteed by the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20; *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). The Sixth Amendment right to effective assistance of counsel extends to plea negotiations. *Missouri v Frye*, ___ US ___; 132 S Ct 1399, 1408; 182 L Ed 2d 379 (2012); *Lafler v Cooper*, ___ US ___; 132 S Ct 1376, 1384; 182 L Ed 2d 398 (2012). In order to prove that defense counsel provided ineffective assistance of counsel, defendant must demonstrate that "(1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced defendant." *Heft*, 299 Mich App at 80-81; see also *Vaughn*, 491 Mich at 669. To establish that defense counsel's representation fell below an objective standard of reasonableness, defendant must show that counsel's conduct was outside the scope of professionally competent assistance under the circumstances. *Vaughn*, 491 Mich at 670. To prove that defense counsel's deficient performance prejudiced defendant, defendant must show that the outcome of the proceeding would have been different but for defense counsel's errors. *Heft*, 299 Mich App at 81; *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012). Defendant bears a heavy burden of proving ineffective assistance of counsel because there is a strong presumption that defense counsel provided adequate representation. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). This Court may not substitute its own judgment for that of defense counsel or second-guess defense counsel on matters of trial strategy, as defense counsel has great discretion with respect to the trial tactics that he employs while trying a case. *People v Pickens*, 446 Mich 298, 330; 521 NW2d 797 (1994); *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

While a defendant does not have the right to receive a plea offer from the prosecution, *Lafler*, 132 S Ct at 1387, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," *Frye*, 132 S Ct at 1408. Thus, in *Frye*, "[w]hen defense counsel allowed the [plea] offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires." *Id*. This Court has stated that "[t]he decision to plead guilty is the defendant's, to be made after consultation with counsel and after counsel has explained the matter to the extent reasonably necessary to permit the client to make an informed decision." *People v Corteway*, 212 Mich App 442, 446; 538 NW2d 60 (1995), citing MRPC 1.2(a) and 1.4(b). Accordingly,

> [t]he test [for determining whether counsel provided effective assistance of counsel] is whether the attorney's assistance enabled the defendant to make an informed and voluntary choice between trial and a guilty plea. Absent unusual circumstances, where a counsel has adequately apprised a defendant of the nature of the charges and the consequences of a plea, an informed and voluntary choice whether to plead guilty or go to trial can be made by the defendant without a specific recommendation from counsel. [*Id*.]

Defendant argues in this case that his trial counsel's performance rendered him unable to make an informed and voluntary choice to go to trial. Defendant has not demonstrated that defense counsel's performance regarding plea negotiations was objectively unreasonable. *Vaughn*, 491 Mich at 670. At the *Ginther* hearing, defense counsel provided the following testimony:

-4-

> I had extensive discussions with [defendant] concerning what his expectations were of a plea and what he would accept, and I did discuss this with the prosecutor. We were very, very far apart. We never got a formal offer, but I think we were -- they were looking around [sic] 30 years. [Defendant] was looking, as I remember, [for] something around 15 to 20, in that range there, and a possible murder 2.

Additionally, defense counsel confirmed that, at the final conference on June 11, 2013, the prosecution indicated that it might make an offer of 30 to 60 years' imprisonment in addition to two years' imprisonment for the felony-firearm charge, but that "[defendant] was not interested in that offer." Defense counsel acknowledged that he did not ask defendant any questions on the record regarding that offer because he previously had "numerous discussions [with defendant] about what he was willing to take," and "there was no indication . . . [that] he was ever willing to take 30 years." Defense counsel also testified that he told defendant that the final conference was the last day to accept a plea offer and that the case would proceed to trial after the hearing was over. Likewise, defense counsel testified that he and defendant both signed the final conference order, which included a statement in all capital letters that "[n]o pleas will be entertained by the [c]ourt after this date," and that defendant had no questions about the content of the order when defense counsel asked. Defense counsel also stated that, "[a]t the final conference, there was no doubt we were going to trial. When we walked in, he wanted to go to trial. He didn't want the offer."

Contrary to defense counsel's testimony, defendant testified that he was only aware that "the offer of the 30 plus 2 [was] on the table. At that time[,] I leaned over and I asked [defense counsel] would there be any other offer before this trial actually started, and he leaned over and told me that, yes, possibly, [there] could be something else before trial started." Defendant also testified that he did not get a chance to read the order before he signed it, explaining that he would have notified defense counsel that he was willing to take an offer of "30 plus 2 years" if he had actually read the order and understood that this was the last opportunity that he would have to accept a settlement offer. Defendant also denied that he ever stated that the longest minimum sentence he would accept was 15 years' imprisonment, that he was not interested in the 30- to 60-year sentence, and that he actually wanted to go to trial. On cross-examination, defendant acknowledged that he never received a plea offer in writing. However, defendant testified that "the day before [the] final conference, [defense counsel] came to see me in the county jail, and the first offer that he said [the prosecution] offered was actually 35 plus 2. And then[,] when we came to the final conference the next day, [the prosecutor] came down to 30 plus 2."

The trial court concluded that defense counsel's testimony was "very convincing" and defendant's testimony was "totally incredible." The trial court found that defense counsel had met with the prosecutor and defendant and discussed potential plea offers, but that defendant had expressed that he was unwilling to accept those offers. Thus, the trial court concluded that a formal offer was never extended to defendant orally or in writing given defendant's indication that he was not willing to accept an offer. The trial court also found that the prosecution stated at the final conference that defendant could plead guilty to second-degree murder and receive a sentencing agreement of 30 years' imprisonment plus two years' imprisonment for the felony-firearm charge, but that no offer was provided to defendant in writing because defendant did not

express any interest in accepting that offer. Accordingly, the trial court denied defendant's motion for a new trial, concluding that

> defendant did receive effective assistance of counsel . . . , [defendant] was knowledgeable as to the fact that settlement negotiations had been endeavored by [defense counsel], to no avail, and . . . defendant knew that once the Final Conference had been completed, he was bound to undergo trial on the original charges brought against him.

This Court will not resolve credibility issues anew, as "[c]redibility is a matter for the trier of fact to ascertain." *People v Vaughn*, 186 Mich App 376, 380; 465 NW2d 365 (1990). Thus, given the testimony provided by defense counsel at the *Ginther* hearing, which the trial court found to be credible, there is no indication that the trial court's factual findings—including that defense counsel had discussed settlement positions with defendant, that the prosecution did not extend a formal settlement offer to defendant because he had indicated that he was not interested in accepting an offer, and that defendant was aware that he could no longer negotiate a settlement agreement after the final conference—were clearly erroneous. *Dendel*, 481 Mich at 130; *Russell*, 297 Mich App at 715. Consequently, defendant has failed to establish that defense counsel's performance fell below an objective standard of reasonableness, as the trial court's factual findings demonstrate that defense counsel kept defendant fully informed throughout the process and enabled the defendant to make an informed and voluntary choice between trial and a guilty plea. *Corteway*, 212 Mich App at 446.

Further, given the trial court's factual findings, defendant has failed to establish that there is a reasonable probability that he was prejudiced by defense counsel's performance under the second prong of the ineffective assistance test. *Heft*, 299 Mich App at 80-81. To establish prejudice "[i]n the context of pleas[,] a defendant must show [that] the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S Ct at 1384; see also *People v Douglas*, 496 Mich 557, 598; 852 NW2d 587 (2014) (citing *Lafler*). Contrary to defendant's arguments, the trial court found that defendant was aware of the deadline for plea negotiations and still expressed no interest in the potential plea offer mentioned by the prosecutor on the record during the final conference. Accordingly, there is not a reasonable probability that the outcome of the final conference, i.e., proceeding to trial, would have been different had defense counsel provided additional advice or requested an adjournment of the final conference. *Heft*, 299 Mich App at 81. Likewise, given that the trial court found that defendant was informed of the settlement negotiations and the deadline for accepting a plea offer, defendant has not "show[n] that the result that did occur was fundamentally unfair or unreliable." *Lockett*, 295 Mich App at 187. Therefore, because defendant has failed to demonstrate that defense counsel provided ineffective assistance of counsel during the plea bargaining process and at the final conference, the trial court did not abuse its discretion in denying defendant's motion for a new trial. *Russell*, 297 Mich App at 715.

## II. SUFFICIENCY OF THE EVIDENCE

Next, defendant argues that there was insufficient evidence presented at trial for a reasonable jury to find beyond a reasonable doubt that he killed Ajena Peavy with premeditation and deliberation. We disagree.

"In determining whether the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court is required to take the evidence in the light most favorable to the prosecutor" and to ascertain "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010) (quotations marks and citations omitted). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Allen*, 201 Mich App 98, 100; 505 NW2d 869 (1993). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

"The elements of premeditated murder are (1) an intentional killing of a human being (2) with premeditation and deliberation." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009), citing MCL 750.316(1)(a). Defendant challenges only the premeditation and deliberation element of the offense. This Court has identified four types of evidence that may establish premeditation: "(1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *Unger*, 278 Mich App at 229 (citation omitted). Additionally, to support a finding of premeditation and deliberation, the evidence must show that a period of time passed between the moment at which the defendant developed the intent to kill and the moment of the actual killing, but "the time required need only be long enough to allow the defendant to take a second look." *Id*. (internal quotation marks and citation omitted).

First, drawing all reasonable inferences in favor of the prosecution, the parties' relationship and defendant's actions prior to the killing provided circumstantial evidence from which a jury could draw a reasonable inference of premeditation and deliberation. *Id* at 229. The evidence demonstrated that defendant and Peavy had been in a "committed relationship" for two years prior to the incident, and that contention had arisen in their relationship in the 24 hours prior to the killing. Defendant testified that he had called and texted Peavy numerous times during the night before the killing, acknowledging that the numbers provided by the prosecution—64 text messages and 59 phone calls—did not surprise him. Defendant's testimony regarding the messages and calls supports an inference that defendant conveyed suspicion and anger in the text messages and phone calls. Moreover, immediately after speaking to Peavy that morning, defendant admitted that he "tried basically [to] check [Peavy's] story" by texting Hicks. Defendant took a cab to Peavy's home with a loaded gun even though he was aware that it was illegal for him to carry a gun due to his prior felony conviction. Accordingly, this sequence of events suggested that defendant had a motive for killing Peavy and supported an inference of premeditation and deliberation. See, e.g., *People v Fisher*, 449 Mich 441, 453; 537 NW2d 577 (1995) ("In fact, numerous prior cases have upheld the admissibility of evidence showing marital discord as a motive for murder, or as circumstantial evidence of premeditation and deliberation."); *People v Herndon*, 246 Mich App 371, 416; 633 NW2d 376 (2001) (stating that a motive to kill may provide additional circumstantial evidence of a defendant's premeditation).

Second, the testimony provided by Hicks and Culver regarding the circumstances of the killing supported a finding of premeditation and deliberation. Contrary to defendant's assertion that he "basically lost it and pulled out [his] gun and shot," Culver's testimony demonstrated that the incident included periods of time, between the moment at which defendant developed the intent to kill and the moment at which he shot Peavy, sufficient for defendant to take a second look and to reflect on what he was doing. *Unger*, 278 Mich App at 229. Enough time passed for Peavy to say "Momma," get on her knees, and attempt to move backward before defendant fired the first shot. Further, it appears from Culver's testimony that the first gunshot removed three of Peavy's fingers but did not kill her, as Culver noticed that three of Peavy's fingers were missing while her hands were raised in front of her face. Defendant then fired additional gunshots, which ultimately resulted in five gunshot wounds to Peavy. Furthermore, Hicks and Culver both testified that when they attempted to intervene during the incident, defendant pointed the gun at Hicks, Hicks stepped back and began to close the front door, and defendant then fired at least one more shot at Peavy, further demonstrating that defendant had an additional opportunity to stop and reconsider his actions before he continued to shoot Peavy.

Third, defendant's casual demeanor after the killing also supported an inference of premeditation and deliberation, since the evidence demonstrated that he appeared unaffected by the killing. Instead of appearing surprised or alarmed that he had killed the woman with whom he had been in a "committed relationship," or expressing any sort of emotion suggesting that he had "basically lost it," Hicks and Culver testified that defendant "walked off the porch like nothing [had] happened."

At trial, defendant provided contrary testimony that "the shooting occurred quickly and on a sudden impulse" due to the news that Peavy was ending their relationship, combined with defendant's recent knowledge of Peavy's miscarriage and the abuse experienced by his son. However, it is the jury's role to determine the credibility of the witnesses and the weight that should be afforded to the evidence presented at trial, *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013), and this Court must "draw all reasonable inferences and make credibility choices in support of the jury verdict," *Nowack*, 462 Mich at 400. Therefore, reviewing the evidence in the light most favorable to the prosecution, there was sufficient evidence presented at trial for a reasonable jury to find that the prosecution proved the element of premeditation and deliberation beyond a reasonable doubt. *Id*.

Affirmed.

/s/ Jane M. Beckering
/s/ Kathleen Jansen
/s/ Mark T. Boonstra