*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 9, 2019

Plaintiff-Appellee,

v

No. 336775
Oakland Circuit Court

NICHOLAS COLE SINNETT,

LC No. 2016-259413-FC

Defendant-Appellant.

Before: MURRAY, C.J., and JANSEN and RIORDAN, JJ.

PER CURIAM.

A jury convicted defendant of armed robbery, MCL 750.529; possession of a firearm during the commission of a felony, MCL 750.227b; and unlawfully driving away a motor vehicle, MCL 750.413. The trial court sentenced defendant as an habitual offender, fourth offense, MCL 769.12, to prison terms of 25 to 60 years for the armed robbery conviction and 2 to 20 years for the unlawfully driving away a motor vehicle conviction, and to a consecutive two-year term for the felony-firearm conviction.[1] We affirm.

## I. BACKGROUND FACTS

On April 18, 2016, the victim, Kara Volpe, arrived home at approximately 9:00 p.m. and saw a black pickup truck with its lights on in the road near her house. As she exited her Jeep, the truck sped down the road. On April 19, her husband, Joe Volpe, the vice-president of sales and purchasing at Detroit Wheel & Tire, received a call from a number with the northern Michigan area code of 231. The caller identified himself as "Jason" and said that he wanted to meet with Joe that day to conduct some business. Joe declined a meeting, but asked his northern Michigan salesperson to contact the caller. The caller thereafter sent a text message to Joe telling him not to share his phone number with anyone.

---

[1] All three sentences are "consecutive to parole."

Later on April 19, Joe went home to do some work. The lawn care person, Greg Watts, was working on the lawn when he saw a black Ford F-150 pickup truck drive past the house multiple times before parking in the street. A man got out of the truck and walked up the driveway. Around the same time, Joe's employee at Detroit Wheel & Tire, Jason Busti, stopped by. The man, who had an "Amanda" tattoo on his neck, inquired about lawn care and obtained a business card from Watts. The man also inquired whether the house was for sale and asked if he could go inside. Busti went inside and told Joe about the man's inquiry. Busti later saw the man walk to the F-150. Busti identified defendant in court as the man he saw at the Volpe home on April 19.

On the afternoon of April 20, Kara and her mother, Charlene Rivard, were cleaning Kara's house when defendant,[2] whom Kara testified she had never seen before, came to the door and inquired about the name of the lawn care person. Defendant was dressed in professional attire and had a tattoo with the name "Amanda" going down his neck. Defendant said that he had spoken to the lawn care person the day before but did not get his business card. Kara gave defendant Watts's phone number. Defendant then asked Kara if she was interested in selling her house. When Kara told defendant that she had recently purchased the house, defendant told her that he could sell the house at a price that Kara knew exceeded the appraised value of the house. She told defendant that she would have to talk to her husband. Kara noticed defendant look down at her ring finger, and she felt compelled to tell him that she was not wearing her rings because she was doing spring cleaning. Defendant asked if he could look at the house, and Kara permitted him to look around the outside only. Defendant said that his name was "Mike" and he provided a business card with a phone number with a 480 area code. Kara went inside and called Joe, who told her that a man had come to the house the day before and had the same inquiries. Defendant came back to the door and asked Kara to come outside. He asked her about the property line. At that point, Kara noticed that defendant's worn black square-toed shoes with stitching on the top did not match his attire. Defendant asked Kara questions about her Jeep and, before leaving, defendant told her that "a girl like her really should be wearing her wedding ring." When defendant speculated that Kara's rings were in her Jeep, Kara told him that her rings were in the house.

Kara put her rings on before she and Rivard went to the store. She forgot to lock the door to the house before leaving. The two returned to the house about an hour later. Kara went to the backyard and Rivard stayed inside the house. As she was kneeling down to tie cushions on the patio chairs, Kara noticed a person dressed all in black, with only his forehead exposed, pointing a gun at her. The man had white skin and had a tall and slim build like defendant. Kara was 100 percent positive that the man was wearing the same shoes that she had seen defendant wearing earlier that day. The man screamed at Kara and threatened to kill her if she did not give him her rings. Defendant also threatened to shoot Rivard when she went outside in response to Kara's screams. The man demanded the key fob for Kara's Jeep. As he went into the garage to retrieve the key fob, and before driving away in Kara's Jeep, the man said, "Tell Joe not to f___ with me

---

[2] Defense counsel said during her opening statement that defendant admitted that he was at the Volpe home on the afternoon of April 20.

and stay out of my shit." Kara's wallet, which contained credit cards, a debit card, and cash, and her cell phone were inside the Jeep. Kara placed a 911 call just before 4:00 p.m.

Police recovered Kara's Jeep about one-half mile from her home. A pneumatic gun and Kara's cellular telephone were on the passenger seat. Her wallet was missing. Surveillance video of the parking lot of the business where police found Kara's Jeep showed a black F-150 back into a parking spot at 3:45 p.m. on April 20. A man walked from the vicinity of the truck and across the parking lot. At 4:02 p.m., the video showed Kara's Jeep pull into the parking lot and back into the parking spot next to the F-150. The driver exited the Jeep and walked toward the F-150, which then drove off.

The police investigation linked the 231 telephone number to defendant. A search of defendant's name produced a photograph of defendant. Kara identified defendant in a photographic array as the man who had been at her house the day of the robbery. Police subsequently arrested defendant at a house on Mulberry Street in Wyandotte. Defendant admitted that he drove the black F-150 that was backed into the driveway at the house. A zippered pouch containing Joe's business card, pawn shop business cards, and real-estate-related business cards was found during a search of the F-150. Jewelry and documents regarding jewelry were discovered during a search of the Mulberry Street home, which belonged to defendant's girlfriend, Collette Morton. Morton had an Arizona driver's license with an address in Mesa, Arizona. The area code in Mesa is 480, which is the same area code for the phone number that Kara received from defendant.

Defendant provided police with information about a man named Duane Butler and said that Butler was involved with stolen cars, wheels and tires, and credit card manufacturing devices. He provided a tip about an address on Minock Street in Detroit and said that there would be a green Dodge Ram, which was used as a "push vehicle," in the driveway.[3] Police verified that Butler was the owner of the residence. Police observed the green Dodge Ram in the driveway. When the police ran the license plate of the vehicle, the Law Enforcement Information Network (LEIN) system indicated that the vehicle was reported stolen. Butler, a heavyset black man, arrived home while the police were at the residence. During a search of the garage at the property, a stolen Dodge minivan that contained tools to remove tires and wheels, as well as "blocks" for lifting, were found. Many of the wheels and tires found in the garage were matched to stolen vehicles. A credit card reader and several blank Visa gift cards were found inside the residence. Five credit cards, including three of Kara's credit cards, were found in a nightstand. Also found was a check for $2,000 from Detroit Wheel & Tire to Duane Butler for payment of a purchase order. Duane Butler had been a customer of Detroit Wheel and Tire for a year prior to the robbery. He previously had seen Kara at the business and had made a comment to Joe about Kara's engagement ring and asked what he paid for it. Joe told Butler that he paid about $30,000 for the ring.

Defendant was tried and convicted as already noted. This appeal followed.

---

[3] A push vehicle is used to pull up behind a vehicle that has been put into neutral and push the car away.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the effective assistance of counsel at trial because (1) trial counsel deprived him of a possible defense by failing to investigate and call witnesses, and (2) trial counsel sent rebuttal witnesses to the wrong courthouse on the final day of trial. Thus, he claims that the trial court abused its discretion by denying his motion for a new trial. We disagree.

## A. STANDARD OF REVIEW & APPLICABLE LAW

Whether a defendant was deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Any findings of fact are reviewed for clear error, while the legal questions are reviewed de novo. *Id*. Regard should be given to the trial court's opportunity to assess the credibility of the witnesses who appear before it. MCR 2.613(C); see also *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). A trial court's decision whether to grant a motion for a new trial is reviewed for an abuse of discretion. *People v Schrauben*, 314 Mich App 181, 187; 886 NW2d 173 (2016).

"To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability [exists] that the outcome of the proceeding would have been different but for trial counsel's errors." *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). Defense counsel is presumed effective. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). "Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *People v Petri*, 279 Mich App 407, 411; 760 NW2d 882 (2008). A defendant claiming ineffective assistance has the burden of establishing the factual predicate for the claim. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

"The failure to reasonably investigate a case can constitute ineffective assistance of counsel," but only when such failure "undermines confidence in the trial's outcome." *People v Anderson*, 322 Mich App 622, 630-631; 912 NW2d 607 (2018). Likewise, defense counsel's failure to present a given defense "is only considered ineffective assistance if it deprived the defendant of a substantial defense." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). "A substantial defense is one that could have affected the outcome of the trial." *Id*. "Decisions regarding whether to call or question a witness are presumed to be matters of trial strategy." *Id*. "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999).

## B. ANALYSIS

In support of his claim that trial counsel failed to investigate a possible defense, defendant first contends that he told his trial counsel, Paulette Michel Loftin, that he and Kara had an affair and that he could provide witnesses, specifically Madeline and Scorpio Lenoir, Autumn Steele, Jake Hardacre, and Sandra Sinnett, to testify that they had seen him and Kara together in late March 2016, thereby impeaching Kara's testimony that she did not know

defendant. Loftin testified at the *Ginther*[4] hearing that defendant provided the name of just one witness, Maria Leach, and that defendant expected her to tell the witness what her testimony would be. Loftin subsequently learned that Leach was the sister of one of defendant's cellmates and, after she contacted Leach, "it was blatantly clear that she would be perjuring herself if she was to come in and testify." Loftin denied that defendant gave her the names of any other witnesses. Defendant denied providing Loftin with Leach's name and testified that it was Loftin who brought up Leach's name and said that she could "pay off" Leach and a sheriff to be witnesses for defendant.

The trial court found Loftin's testimony credible and found defendant's testimony about Loftin paying off witnesses incredible. We give deference to the trial court's credibility determinations. *Dendel*, 481 Mich at 130. The court's finding that Maria Leach was the only name that defendant provided to Loftin and that they did not discuss any other witnesses is supported by Loftin's testimony and is not clearly erroneous. See *id*. We will not find Loftin "ineffective for failing to pursue information that [her] client neglected to tell [her]." *People v McGhee*, 268 Mich App 600, 626; 709 NW2d 595 (2005).

There also is no clear error in the trial court's finding that defendant failed to present credible evidence to support the factual allegation that Loftin sent rebuttal witnesses to the wrong courthouse because the trial court found Loftin's testimony credible and defendant failed to produce witnesses in support of that claim. See *Dendel*, 481 Mich at 130. Defendant has failed to show that counsel's performance fell below an objective standard of reasonableness. *Ackerman*, 257 Mich App at 455. Thus, defendant's claims of ineffective assistance of counsel are without merit.

## III. CONSTITUTIONAL RIGHT TO TESTIFY

Defendant argues that the trial court failed to take sufficient steps to protect defendant's constitutional right to testify after defendant informed the court that a proposed prosecution rebuttal witness who was in a holding cell with defendant the previous day told defendant, "Don't be a rat. I know Duane." Because defendant did not argue in the trial court that he was denied his constitutional right to testify on his own behalf, we review this unpreserved claim of error for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

The constitutional right to testify on one's own behalf at a criminal trial is essential to due process of law. *People v Soloman*, 220 Mich App 527, 533-537; 560 NW2d 651 (1996). A defendant's right to testify in his own defense arises from the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011). Although counsel must advise defendant of this right, the ultimate decision whether to testify at trial remains with the defendant. *Id*. In *People v Harris*, 190 Mich App 652, 661-662; 476 NW2d 767 (1991), this Court held that the trial court has no duty to advise a defendant of the right to testify on one's own behalf. *Harris* further held that, at trial, a

---

[4]*People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

court is not required to determine whether a defendant's failure to testify was the result of a knowing and intelligent waiver of that right. *Id.* If the defendant "decides not to testify or acquiesces in his attorney's decision that he not testify, the right will be deemed waived." *People v Simmons,* 140 Mich App 681, 685; 364 NW2d 783 (1985) (quotation marks and citation omitted).

Here, the trial court provided defendant the opportunity to consult with counsel before making a decision whether to testify. The court then placed defendant under oath and questioned him about the alleged threat. Defendant agreed on the record that he had sufficient time to talk with counsel and that he was aware that he had an absolute right to testify. Indeed, on appeal defendant does not dispute that it was his decision not to testify.

Although defendant argues that his waiver of the right to testify was not voluntary because of the alleged threat, and maintains that the trial court should have questioned the rebuttal witness about the threat, defendant did not ask the court to question the rebuttal witness. Even assuming that the trial court's handling of defendant's waiver of his right to testify was erroneous, the record does not support a finding that the error affected the outcome of the trial. The trial court, which had the ability to assess defendant's credibility, found significant portions of defendant's testimony at the *Ginther* hearing to be incredible, and it is likely that a jury would have similarly found defendant's testimony incredible had he testified at trial. Thus, defendant has failed to show any plain error affecting his substantial rights. *Carines*, 460 Mich at 763-764.

## IV. ADMISSION OF JAILHOUSE LETTERS AND PHONE CALLS

Defendant next argues that the prosecutor failed to establish the proper foundation for the authenticity of defendant's jailhouse telephone calls and letters and that the trial court erred by admitting the telephone calls and letters at the *Ginther* hearing. We disagree.

### A. STANDARD OF REVIEW & APPLICABLE LAW

We review for an abuse of discretion a trial court's decision whether a proponent of evidence sufficiently authenticated the item for admission. *People v Ford*, 262 Mich App 443, 460; 687 NW2d 119 (2004). MRE 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "Factors to be considered in making this determination include the nature of the article, the circumstances surrounding the preservation and custody of it, and the possibility of intermeddlers tampering with it." *People v Muhammad*, 326 Mich App 40, ___; ___ NW2d ___ (2018) (Docket No. 338300) (quotation marks omitted); slip op at 8. "If, after considering such factors, the trial judge is satisfied that in reasonable probability the article has not been changed in important respects, he may permit its introduction in evidence." *Id.* (quotation marks omitted).

### B. ANALYSIS

The trial court did not abuse its discretion in finding that the telephone calls were sufficiently authenticated. The prosecutor presented the testimony of Gary Miniard, the person in charge of obtaining prison telephone call recordings. He testified that each prison inmate has an account that is activated by a voice biometric system that is 99.9% effective and that the only

way an inmate can make a call is by using his own voice as the password. Miniard accessed the telephone calls recorded on defendant's account and transferred defendant's recorded telephone calls onto two CDs. Miniard's testimony was sufficient to authenticate that the calls made using defendant's voice-activated account were made by defendant. Thus, a witness with personal knowledge of how the evidence was created testified that the evidence was "what its proponent claims" as required by MRE 901(a) and MRE 901(b)(1) (testimony that a matter is what it is claimed to be). Further, the content of the phone calls contained distinctive characteristics and information relevant to defendant's case. These distinctive characteristics authenticated the calls as belonging to defendant. MRE 901(b)(4) (appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances); see also *Muhammad*, 326 Mich App at ___; slip op at 8.

The trial court also did not abuse its discretion in finding that the letters were sufficiently authenticated.[5] Miniard testified that in order for an inmate to get postage to send a letter, the inmate had to include his or her name, inmate number, and prison address on the envelope and then the envelope would be returned to the inmate. Afterword, Miniard intercepted defendant's letters from the mail room, copied them, and then sent them on to the addressees. He recognized the letters offered at the hearing as those he had intercepted and copied. The envelopes had defendant's name, inmate number, and facility address on them. Additionally, Miniard testified that he was familiar with defendant's handwriting from prison visitor lists and defendant's prison file and that he recognized defendant's handwriting on the letters. Thus, a witness with personal knowledge of how the evidence was created testified that the evidence was "what its proponent claims" as required by MRE 901(a); MRE 901(b)(1); and MRE 901(b)(2) (nonexpert opinion as to genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation). Further, Miniard testified that the contents of the letters were "spot on" to "what was being investigated." The content of the letters, taken in conjunction with the circumstances, authenticated the letters as belonging to defendant. MRE 901(b)(4); see also *Muhammad*, 326 Mich App at ___; slip op at 8.

## V. DELAYED DISCLOSURE OF EVIDENCE

Defendant also argues that the prosecutor failed to timely disclose some of defendant's jailhouse calls and letters prior to the *Ginther* hearing as required by criminal discovery rules.[6] He maintains that he was prejudiced by the late disclosure of evidence that was unfavorable to him because he was not able to obtain expert testimony that could have shown that the voice on the calls was not his and that the letters were not written by him. Because defendant did not challenge the trial court's decision to admit the jailhouse telephone calls and letters at the *Ginther* hearing on the ground that the prosecution did not timely disclose the evidence, defendant did not preserve this issue. Thus, our review is for plain error affecting substantial

---

[5] The trial court did not consider the letters in its opinion and order denying defendant's motion for a new trial.

[6] Defense counsel's e-mail request to the prosecution was for production of recorded jailhouse telephone calls and did not include production of any written statements.

rights. *Carines*, 460 Mich at 763-764. The interpretation of a court rule is a question of law that we review de novo. *People v Buie*, 285 Mich App 401, 416; 775 NW2d 817 (2009).

MCR 6.201(A) provides that upon request a party must provide all other parties: (1) the names and addresses of all lay and expert witnesses whom the party may call *at trial*, (2) any written or recorded statement, including electronically recorded statements, pertaining to the case by a lay witness whom the party may call *at trial*, (3) the curriculum vitae of an expert the party may call *at trial*, (4) any criminal record that the party may use *at trial* to impeach a witness, (5) a description or list of criminal convictions, known to the defense attorney or prosecuting attorney, of any witness whom the party may call *at trial*, and (6) a description of and an opportunity to inspect any tangible physical evidence that the party may introduce *at trial*.

MCR 6.201(B) governs discovery of information known to the prosecuting attorney. As pertinent to this case, the court rules provide that upon request, a prosecutor must provide "any written or recorded statements, including electronically recorded statements, by a defendant, codefendant, or accomplice pertaining to the case, even if that person is not a prospective witness *at trial* . . . ." MCR 6.201(B)(3) (emphasis added).

MCR 6.201 expressly contemplates that discovery should be provided before trial. Nothing in this court rule provides for post-conviction discovery in a criminal case, such as at a *Ginther* hearing. In addition, defendant has not cited any authority providing that the criminal discovery rules apply to post-conviction proceedings. Defendant has failed to demonstrate plain error in the admission of those telephone calls admitted at the *Ginther* hearing because they were not provided to defendant prior to the hearing.

## VI. CONCLUSION

Affirmed.

/s/ Christopher M. Murray
/s/ Kathleen Jansen
/s/ Michael J. Riordan