*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KEMIA NEKENAH HASSEL,

Defendant-Appellant.

UNPUBLISHED
October 27, 2022

No. 350654
Berrien Circuit Court
LC No. 2019-000220-FC

Before: SHAPIRO, P.J., and GADOLA and YATES, JJ.

PER CURIAM.

Defendant appeals as of right her convictions, following a jury trial, of first-degree premeditated murder, MCL 750.316(1)(a), and conspiracy to commit first-degree murder, MCL 750.157a & MCL 750.316(1)(a). The trial court sentenced defendant to life imprisonment without parole for the first-degree murder conviction and life imprisonment for the conspiracy to commit murder conviction. We affirm.

## I. BACKGROUND

Defendant's convictions arise from the shooting death of her husband, Tyrone Hassel III, on December 31, 2018. Defendant and Hassel were spending their holiday leave from the Army at Hassel's family home in Benton Harbor. The prosecution presented evidence that Jeremy Cuellar, who was also in the Army, shot and killed Hassel outside the family home. Defendant, Hassel and Cuellar were all stationed together in Korea. After the police confronted defendant with information about Cuellar's suspected involvement and their knowledge that defendant and Cuellar were involved in a relationship,[1] defendant gave a statement in which she admitted being

---

[1] The information about Cuellar's suspected involvement came from Jaquan Hamilton, who was also in the Army and had previously been stationed in Korea with defendant, Hassel and Cuellar. Hamilton testified at trial that one day Cuellar told him that "Buddy" had to go and that he wanted to do it around block leave time. Cuellar had just been with defendant, and when Cuellar said

-1-

involved in a sexual relationship with Cuellar and plotting with Cuellar to kill Hassel and collect life insurance benefits of $400,000. In addition, while defendant was in jail, she spoke to her mother on a call that was recorded. Defendant spoke about Cuellar, told her mother that she "got myself mixed up in something," and said that she and Cuellar planned it in Korea so that they could be together. Defendant's mother asked defendant if someone was making her tell this story and defendant denied it.

After defendant filed a claim of appeal, we granted her motion to remand for a *Ginther*[2] hearing.[3] On remand, she moved for a new trial, arguing that her trial counsel was ineffective for failing to file a motion to suppress her inculpatory statement to the police, and for failing to pursue a defense based on battered partner syndrome. After conducting a *Ginther* hearing, at which both defendant and trial counsel testified, the trial court denied defendant's motion.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

On appeal, defendant renews her two claims of ineffective assistance of counsel. First, she argues that trial counsel was ineffective by failing to challenge the admissibility of her inculpatory police statements in a pretrial motion to suppress, and instead electing to argue before the jury at trial that the police interrogation was coercive and her resulting statements were inaccurate and unreliable. Second, she argues that trial counsel was ineffective for failing to present evidence of Hassel's abuse of her during the marriage and failing to consult an expert to determine the merits of a self-defense claim based on battered partner syndrome.[4]

Defendants have a constitutional right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an

---

"Buddy," he meant Hassel. When Hamilton asked Cuellar what his plans were, Cuellar said that the money was a bonus, meaning the life insurance benefits. When Hamilton asked why defendant and Hassel could not just get divorced, Cuellar said that was not an option. Cuellar explained that doing it during block time would be easier, as would the getaway. When Hamilton asked if that was what defendant wanted, Cuellar told him that it was "mutual" that it had to be done.

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] *People v Hassel*, unpublished order of the Court of Appeals, entered September 3, 2020 (Docket No. 350654).

[4] Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel. *People v Grant*, 470 Mich 477, 484-485; 684 NW2d 686 (2004). "Findings on questions of fact are reviewed for clear error, while rulings on questions of constitutional law are reviewed de novo." *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). "[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C); *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008).

objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id.*

## A. FAILURE TO FILE A MOTION TO SUPPRESS

After the *Ginther* hearing, the trial court found that Detective-Lieutenant Andrew Longuski's questioning of defendant was neither coercive nor unfairly manipulative, and that defendant's statements were freely and voluntarily made. Therefore, the trial court found that any attempt by trial counsel to suppress the statements would have been unsuccessful, and accordingly, trial counsel was not ineffective for failing to file a motion to suppress. The trial court's findings on this issue are not clearly erroneous.

"A statement obtained from a defendant during a custodial interrogation is admissible only if the defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights." *People v Akins*, 259 Mich App 545, 564; 675 NW2d 863 (2003). "The ultimate test of admissibility is whether the totality of circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988). In considering whether a confession was voluntary, the court must consider the following factors:

> (1) the age of the accused; (2) his lack of education or his intelligence level; (3) the extent of his previous experience with police; (4) the repeated and prolonged nature of the questioning; (5) the length of the detention of the accused before he gave the statement in question; (6) the lack of any advice to the accused of his constitutional rights; (7) whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; (8) whether the accused was injured, intoxicated, drugged, or in ill health when he gave the statement; (9) whether the accused was deprived of food, sleep, or medical attention; (10) whether the accused was physically abused; and (11) whether the suspect was threatened with abuse. [*Id.*]

On January 11, 2019, defendant was requested to appear with her phone at the Berrien County Sheriff's Department. At approximately 8:48 p.m., a lieutenant spoke to defendant and advised her of her *Miranda* rights. Sergeant Mike Lanier, a St. Joseph Township police officer who was also present, testified that defendant seemed to understand those rights and did not ask any questions regarding her rights. Defendant denied any involvement in Hassel's death in this initial interview, which lasted about 50 minutes. According to defendant, the police told her she had to take a polygraph examination in Lansing in order to clear her name. The trial court did not find this testimony credible, however, given the trial testimony that defendant was told she was free to leave at any time.

It was close to midnight when defendant arrived at the Michigan State Police headquarters in Lansing. Defendant then met with Longuski, who advised her that she was free to leave at any time, and he again read defendant her *Miranda* rights; both he and defendant signed the accompanying advice-of-rights form. Longuski testified at trial that defendant acknowledged that she understood each right as it was read to her, and she did not ask any questions or appear

confused in any way. At the *Ginther* hearing, defendant agreed that Longuski read the *Miranda* rights to her and that she signed a card stating that she understood her rights. During the initial 90-minute interview with Longuski, defendant continued to deny any involvement in her husband's death. Defendant then took a polygraph test. She did not believe that the polygraph lasted very long, and afterwards Longuski took a break. At approximately 1:30 a.m., defendant was interviewed for a second time by Longuski for about an hour and fifteen minutes. It was during this interview that defendant made incriminating statements to Longuski.

The trial court did not clearly err by finding that the *Cipriano* factors do not indicate an involuntary confession. Although defendant was only 22 years old and had no previous experience with the police, she was a sergeant in the Army, had been deployed overseas for several months, and was married and a mother. There was no evidence to suggest that her age or intelligence prevented her from understanding her rights or from knowingly and intelligently waiving those rights, which she did on two occasions. In addition, Longuski testified that defendant did not appear to be confused in any way, and that she appeared to be comfortable with him. Further, the trial court did not clearly err by finding that defendant was not subjected to unnecessarily repeated or prolonged questioning. Defendant was questioned for about an hour in Berrien County and then interviewed and polygraphed for about two hours in Lansing. There were breaks between the police interviews, and no unnecessary delays.

Considering the remaining factors, there was no evidence that defendant was injured, intoxicated, or in ill health when she was being interrogated by Longuski. Nor was there any evidence that defendant had been deprived of food or medical attention. The trial court found that defendant was offered water on the trip to Lansing, and that she was given water and a snack at some point while in Lansing. Further, there was no evidence that defendant was physically abused or threatened with abuse. Defendant testified that she was tired because of the timing of the interview and because she had not been sleeping since Hassel had been killed. But she did not inform the police that she was tired, and Longuski testified that defendant did not appear tired or overly exhausted. And the timing of the interview was not so late as to outweigh the other factors and render defendant's statements involuntary.

Defendant's argument primarily relies on Longuski's statements that he was in defendant's corner, that he would "go to bat" for her, and that he knew that Cuellar was taking advantage of her and controlling the situation. At trial, Longuski explained that he purposely tried to build a rapport with defendant to elicit incriminating statements from her. This Court has held that a police officer telling a defendant that "he would do what he could to help and that things would go easier for defendant if he would cooperate and tell the truth" does not render subsequent incriminating statements involuntary. *People v Ewing (On Remand)*, 102 Mich App 81, 85-86; 300 NW2d 742 (1980). To the extent that Longuski attempted to project a supportive demeanor, there is no evidence that such conduct was so overbearing that defendant's capacity for self-determination was overcome. The totality of the circumstances surrounding defendant's interrogation with Longuski supports the trial court's finding that her statements were freely and voluntarily made. *Cipriano*, 431 Mich at 334.

Trial counsel testified at the *Ginther* hearing that after watching defendant's interrogation video 20 or 30 times and speaking to defendant about the interrogation, he concluded that

-4-

defendant's statements appeared to be voluntary.[5]  For the reasons discussed, the trial court did not clearly err when it reached this same conclusion at the *Ginther* hearing.  Accordingly, defendant has not established that it was objectively unreasonable for counsel not to file a motion to suppress, or that she was prejudiced by counsel's decision.

## B.  FAILURE TO INVESTIGATE A BATTERED PARTNER SYNDROME DEFENSE

Defendant next argues that trial counsel was ineffective for failing to investigate the violent nature of her marriage to Hassel, which she contends deprived her of a battered partner defense. We again disagree.

At the *Ginther* hearing, defendant testified that after she became pregnant with their son, Hassel became extremely physical, emotionally, verbally, and financially abusive.  She described one incident in which she awoke to find Hassel lying on top of her with his hands around her neck choking her.  She described other incidents in which Hassel choked her, punched her, grabbed her by the arms hard enough to leave bruises, and once hit her in the head with a bottle.  She also claimed that, after the birth of their child, Hassel emotionally abused her by telling her that she did not look good, no one would love her, and that she could not be with anyone else because she did not look the way she used to look.  She further testified that she always had to ask for Hassel's permission to spend any money, including her own paycheck.  Conversely, trial counsel testified that defendant told him that there had been some domestic violence in her relationship with Hassel, but not nearly to the extent that she described at the *Ginther* hearing.  Counsel stated that he consulted another attorney about the potential for a battered partner defense in defendant's case, but determined that the domestic violence described by defendant would not support such a defense.

In *People v Christel*, 449 Mich 578, 579-580; 537 NW2d 194 (1995), the Supreme Court held "that expert testimony regarding the battered woman syndrome is admissible only when it is relevant and helpful to the jury in evaluating a complainant's credibility and the expert witness is properly qualified."  The Court further stated:

> In most cases, the battered woman syndrome is offered by the defendant in a case of homicide in which the defendant is claiming self-defense.  As one court has explained:
>
> > [E]xpert scientific evidence concerning "battered-woman's syndrome" does not aid a jury in determining whether a defendant had or had not behaved in a given manner on a particular occasion; rather, the evidence enables the jury to overcome common myths or misconceptions that a woman who had been the victim of battering

---

[5] Trial counsel additionally testified that he did not want to give the prosecution any clue as to what his arguments at trial would be, and an unsuccessful motion to suppress defendant's statements would have done that.  In reviewing claims of ineffective assistance of counsel, we defer to counsel's reasonable strategic decisions.  See *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007).

> would have surely left the batterer. Thus, the evidence helps the
> jury to understand the battered woman's state of mind. [*State v J Q*,
> 130 NJ 554, 574; 617 A2d 1196 (1993).]

> Although we do not express approval or disapproval of this use, we note that our
> Court of Appeals recently recognized that a majority of jurisdictions favor the
> admissibility of expert testimony on the issue of the battered woman syndrome
> when offered as a means of self-defense. See *People v Wilson*, 194 Mich App 599,
> 603; 487 NW2d 822 (1992), citing anno: *Admissibility of expert or opinion
> testimony on battered wife or battered woman syndrome*, 18 ALR4th 1153.
> [*Christel*, 449 Mich at 589.]

However, the Court also stated "that the admissibility of syndrome evidence is limited to a description of the uniqueness of a specific behavior brought out at trial." *Id.* at 591 (quotation marks and citation omitted).

Self-defense is an affirmative defense that will justify otherwise punishable criminal conduct. *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010). The use of deadly force is authorized if an individual honestly and reasonably believes that it is necessary to prevent the imminent death, great bodily harm, or sexual assault of himself or another. MCL 780.972(1); *People v Conyer*, 281 Mich App 526, 529-530; 762 NW2d 198 (2008). A jury's conclusion that a defendant killed with premeditation "necessarily entails a rejection" of self-defense. *People v Bynum*, 496 Mich 610, 634; 852 NW2d 570 (2014).

To the extent that defendant's description of the severity of Hassel's abuse at the *Ginther* hearing conflicted with the scope of domestic violence that trial counsel claimed defendant described to him, the trial court expressly found that defendant's testimony at the *Ginther* hearing was not credible and instead credited counsel's testimony that defendant had advised him that any abuse was "at most, minimal abuse." In particular, the trial court noted that defendant's description of Hassel's severe abuse at the *Ginther* hearing conflicted with her statements to Longuski in which she agreed that Hassel was "a decent dude" and a better man than Cuellar, and that defendant told another detective that her relationship with Hassel "was good" and that they "argued like normal couples," but there were "no physical altercations." This Court ordinarily defers to the trial court regarding the credibility of the witnesses who appeared before it, MCR 2.613(C); *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), and in this case the trial court also observed that defendant's testimony at the *Ginther* hearing conflicted with statements she gave in her police interviews. The trial court did not clearly err by finding that defendant's description of Hassel's alleged abuse at the *Ginther* hearing was not credible.

In light of the admissibility of defendant's statement to Longuski and her conversation with her mother that she and Cuellar planned to kill Hassel while they were in Korea, which was at least four months before December 31, 2018, trial counsel's rejection of a strategy based on self-defense as a result of battered partner syndrome was not objectively unreasonable. Defendant's admissions that the plan to kill Hassel began four or more months before he was killed negated any honest and reasonable belief that killing Hassel was necessary to prevent defendant's imminent death, great bodily harm, or sexual assault. MCL 780.972(1); *Conyer*, 281 Mich App at 529-530.

Further, even if defendant's testimony at the *Ginther* hearing is credited, it did not support a claim of self-defense based on battered partner syndrome. Such a claim would require evidence that defendant participated in Hassel's shooting death, but acted in self-defense because of repeated and ongoing abuse. Significantly, however, at the *Ginther* hearing defendant denied any involvement in Hassel's shooting death, and she denied ever discussing with Cuellar any plans to shoot or kill Hassel. Thus, even if defendant's testimony at the *Ginther* hearing is credited, it does not support a viable claim of self-defense based on battered partner syndrome.

Accordingly, the trial court did not err by denying defendant's claim that trial counsel was ineffective for not pursuing a battered partner theory at trial.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Michael F. Gadola
/s/ Christopher P. Yates

-7-