*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROY DESHAN ABRAMS,

Defendant-Appellant.

UNPUBLISHED
February 19, 2026
11:04 AM

No. 347854
Wayne Circuit Court
LC No. 18-002500-01-FC

Before: FEENEY, P.J., and GARRETT and BAZZI, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions for (1) one count of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84(1)(a); and (2) two counts of assault with a dangerous weapon (felonious assault), MCL 750.82. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve concurrent sentences of 25 to 50 years' imprisonment for his AWIGBH conviction and 4 to 15 years' imprisonment for each felonious assault conviction. We vacate defendant's convictions and sentences, reverse the trial court's denial of defendant's motion for a new trial, and remand for further proceedings.

## I. FACTS

This case arises out of a physical altercation between defendant and Joseph Kendra. Crucially, no one alleged to have witnessed the incident testified at trial, and the stories told by the two men about that day differ significantly.

## A. DEFENDANT'S TESTIMONY

On February 3, 2018, Kendra showed up at defendant's house at approximately 8:30 a.m. looking for work. Defendant offered to have Kendra repair a flickering light socket for $20. Kendra worked on the repair for a short time and told defendant that the light socket was fixed and that he would be right back. Kendra then stepped out the back door. After about ten minutes, defendant discovered that the light was still flickering. Kendra returned about twenty minutes later visibly high on cocaine. Defendant told Kendra that the light was still flickering. Kendra, with a

-1-

screwdriver in his hand, responded, "I'm not leaving here until you give me my m**********n' money."

Kendra then "sucker punch[ed]" defendant and attacked him with the screwdriver. Defendant fell to the floor and reached for a metal pipe that he had placed beside the refrigerator after completing repairs in the basement the day before. Still on the floor, he began swinging "wildly" at Kendra's legs. Kendra managed to block some blows with his hands and eventually wrested the pipe from defendant. Kendra then began beating defendant with the pipe. At some point, defendant managed to grab hold of a kitchen knife. After defendant stabbed Kendra in the leg a number of times, Kendra surrendered.

In defendant's estimation, the struggle lasted "about 15 minutes tops." Defendant then asked whether Kendra wanted defendant to take him to the hospital, and Kendra said yes. The two men then got into defendant's vehicle and proceeded from defendant's home to Detroit Receiving Hospital. During the drive, the argument about the money resumed, and Kendra demanded to be let out of the truck. Defendant dropped Kendra off close to a gas station and went home.

## B. KENDRA'S TESTIMONY

The night before the altercation, Kendra was at a friend's house, where he snorted a line of cocaine. He then "had a beer or two, went home, [and] fell asleep . . . ." He woke the next morning to a phone call from defendant, who asked Kendra to come over and repair a "melted outlet." Kendra arrived at defendant's home at about 9:00 a.m. After about 20 minutes, Kendra fixed the melted outlet, and before placing the cover on the wall plate and completing the job, he decided to step outside to grab a cigarette and Mountain Dew.

When Kendra returned to the kitchen, defendant was waiting for him with a crowbar in hand. Defendant asked Kendra where the money that was on the dining room table had gone. Kendra adamantly denied taking the money, let alone entering the dining room. Dissatisfied with Kendra's answer, defendant repeated the question and began tapping Kendra's wrists and hands with the crowbar harder each time he denied taking the money. The tapping eventually got hard enough for Kendra to seek refuge beneath the kitchen table.

According to Kendra, defendant beat him with the crowbar for roughly 20 minutes before getting tired. After getting his breath back, defendant told Kendra, "[Y]ou're gonna die in my kitchen tonight, m**********r." This process of defendant beating Kendra for 20 minutes and briefly resting before continuing again went on for 1½ hours. Defendant then grabbed a large carving knife from a kitchen drawer and began stabbing Kendra's legs, which went on for another 30 minutes. At that point, Kendra "surrendered to God" and lost consciousness. When asked by defense counsel how long, in total, Kendra had been beaten by defendant, Kendra testified that "[b]ased on [emergency medical services] reports," the ordeal lasted one hour and 40 minutes.

Kendra came to as he was being carried out of the house and into defendant's truck by defendant and another man. The men left Kendra, who was unconscious again, in an empty alley behind a carwash. At some point, Kendra got the attention of a passing car, and the next thing he remembered was waking up in Detroit Receiving Hospital five days later. There he underwent two surgical procedures over the course of what he testified was a roughly 70 day-long stay: (1)

an "intestinal discectomy" to remove 2½ feet of his small intestines and 4 inches of his large intestines, and (2) a fasciotomy to restore circulation to his leg and prevent amputation at the hip. According to Kendra, treating physicians "recorded and stitched up 17 stab wounds" in total. Kendra also testified that he had broken his leg during the altercation, but the doctors at Detroit Receiving Hospital "missed it."

## C. DEFENSE COUNSEL'S PERFORMANCE AT TRIAL

Defense counsel pursued the theory of self-defense, highlighting several inconsistencies in Kendra's trial testimony. For example, during his closing argument, defense counsel sought to undermine Kendra's credibility by emphasizing his past and present drug use and pointing to the inconsistencies between his testimony and his medical records.[1] Defense counsel emphasized three pages in particular:

> [T]here are 1,737 pages of medical records. I submit that you you [sic] only need to go to Page 27. Remember when I had asked Joseph Kendra was there any reason for you to be combative? He said no. Hospital says he was a combative patient. That's page 27. Page 29, [admits] to having done cocaine 12 hours ago. He told the hospital he did cocaine 12 hours ago. Under oath he told you what the prior night?
>
> * * *
>
> Page 30, comment five, smokes in the last three months. He had five smokes in the last—he can't even be honest about how many cigarettes he smokes. So when [defendant] tells you he was confronted in his kitchen by a crackhead who had a screwdriver, should he not be believed?

Nevertheless, defendant was convicted and sentenced, as stated earlier.

## D. THE *GINTHER*[2] HEARING

Thereafter, defendant moved this Court to remand his case to allow him to move for a new trial or evidentiary hearing with respect to several issues, including ineffective assistance of counsel. That motion was granted, *People v Abrams*, unpublished order of the Court of Appeals, entered December 13, 2019 (Docket No. 347854), and defendant moved for new trial in the trial court.

At the *Ginther* hearing, defense counsel testified that when preparing for trial, his usual practice was to review discovery documents carefully and entirely. But when asked whether he reviewed the approximately 1,700 pages of Kendra's medical records, defense counsel responded: "I recall reviewing his medical records. I cannot say that I reviewed every single page of those

---

[1] Defense counsel made no objection to the admission of over 1,700 pages of Kendra's medical records from his stay at Detroit Receiving Hospital.

[2] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

records." He then added, "The ones that I looked at I know that I reviewed carefully," though "I cannot say under oath that I reviewed every single page but it would be my practice to do so."

Defense counsel acknowledged that, in cases involving a credibility contest between witnesses, his practice was to direct the jury to as many inconsistencies in the testimony of the adverse witness as possible. Defense counsel further agreed that in his closing argument, he attempted to show that Kendra was a lying drug-addict who should not be believed. Considering the content of Kendra's medical records, defense counsel was also asked about the following apparent inconsistencies and exaggerations in Kendra's testimony:

- During Kendra's February hospital stay, doctors never diagnosed or treated him for a broken leg; in fact, x-ray readings affirmatively noted the absence of leg fractures.

- Although Kendra claimed that doctors were considering amputation of his left leg, the medical records did not discuss that course of treatment as a possibility.

- The medical records generally undermined Kendra's claim that before the altercation, he was "in great health." In fact, doctors speculated that Kendra's abdominal issues were likely caused by his prolonged cocaine use.

- The surgical procedure that Kendra called a "discectomy" does not seem to exist.

- In addition to cocaine, Kendra had cannabinoids and benzodiazepine in his blood on the day of the altercation.

- Kendra was hospitalized for 18 days, not 45 days as he testified during the preliminary examination, nor 70 days as he testified at trial.

- The 911 call was placed at 9:24 a.m., and Kendra was admitted to Detroit Receiving Hospital at 9:59 a.m. He therefore could not have arrived at defendant's home at 9:00 a.m. and been tortured for roughly two hours before 911 was called.

When asked whether he would have wanted the jury to know about these discrepancies and exaggerations, defense counsel answered that, at least with respect to the mixture of drugs in Kendra's system on the day of the altercation and the "discectomy" he was alleged to have undergone, expert testimony would have been required, which defense counsel "did not have . . . ." As for the fact that the 911 call was inconsistent with Kendra's narrative of events, defense counsel was skeptical that such evidence would be persuasive because jurors are "more concerned about what is on the 911 call," and they "understand that people get times mixed up." But defense counsel nonetheless concluded that "[t]he bottom line is, I would love for those jurors to have known everything and anything that would have acquitted my client. That's the best answer I can give."

The trial court denied defendant's motion for a new trial, finding that defendant failed to satisfy either prong of his ineffective assistance of counsel claim.

## II. INEFFECTIVE ASSISTANCE

-4-

On appeal, defendant first argues that defense counsel's failure to review all the documentary evidence, and adequately impeach Kendra with that evidence, constituted ineffective assistance of counsel. We agree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because defendant moved this Court to remand his case to allow him to move for a new trial or evidentiary hearing with respect to several issues, including ineffective assistance of counsel, this issue is preserved for appellate review. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). "The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008) (quotation marks and citation omitted), amended 481 Mich 1201 (2008).

## B. ANALYSIS

In *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984), the United States Supreme Court established a two-prong test that a defendant must meet to prove that his or her counsel's assistance was so defective as to require a new trial:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. [*Id*.]

Stated more simply, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. To show that a counsel's performance was deficient, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*

Because there are countless ways to provide effective assistance in a given case, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (quotation marks and citation omitted). "Reviewing courts are not only required to give counsel the benefit of the doubt with this presumption, they are required to affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did." *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012) (quotation marks and citation omitted), vacated in part on other grounds 493 Mich 864 (2012).

Generally, "[t]he questioning of witnesses is presumed to be a matter of trial strategy." *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). But, "[c]ounsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Further, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 US at 690-691. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. When claiming ineffective assistance because of defense counsel's unpreparedness, a defendant must show prejudice resulting from the lack of preparation. *People v Caballero*, 184 Mich App 636, 640; 459 NW2d 80 (1990).

At the *Ginther* hearing, defense counsel acknowledged that this case involved a credibility contest between defendant and Kendra. Therefore, defense counsel's principal aim was to convince the jury that defendant should be believed and Kendra should not. Although defense counsel emphasized Kendra's past and present drug use and pointed to a few inconsistencies between Kendra's testimony and medical records, defense counsel missed a plethora of significant inconsistencies found in Kendra's medical records. For example Kendra testified that: (1) his leg was broken during the incident, but x-rays affirmatively noted the absence of any leg fractures; (2) he had a procedure done to prevent the amputation of his leg, but there was no mention of the possibility of amputation in his medical records; (3) he was "in great health" before the altercation, but doctors speculated that Kendra's abdominal issues were likely caused by his prolonged cocaine use; (4) he had an "intestinal discectomy," but that terminology was not used in his medical records nor does it seem to relate to his alleged injuries; and (5) he was hospitalized for 70 days, but he was only hospitalized for 18 days. Defense counsel's failure to pursue these contradictions is perplexing. Additionally, defense counsel failed to highlight the fact that the 911 call was placed 9:24 a.m., and Kendra was admitted to Detroit Receiving Hospital at 9:59 a.m.; that timeline clearly refuted Kendra's testimony that he arrived at defendant's house at 9:00 a.m., and the altercation lasted, at a minimum, one hour and 40 minutes.

Notably, when asked whether he reviewed the approximately 1,700 pages of Kendra's medical records, defense counsel responded: "I recall reviewing his medical records. I cannot say that I reviewed every single page of those records." He then added, "The ones that I looked at I know that I reviewed carefully," although "I cannot say under oath that I reviewed every single page but it would be my practice to do so." Importantly, defense counsel acknowledged that "[t]he bottom line is, I would love for those jurors to have known everything and anything that would have acquitted my client."

We therefore conclude that although defense counsel pursued a sound trial strategy of self-defense, the choices that defense counsel made when executing that strategy were not reasonable, insofar as he appears to have failed to reasonably investigate the available documentary evidence, thereby overlooking strong evidence that should have been used to impeach Kendra. Defense counsel's failure to adequately review Kendra's medical records—and discover the plethora of

inconsistencies therein—constituted a "less than complete investigation" that was not supported by reasonable professional judgments. See *Strickland*, 466 US at 690-691. In fact, not only did defense counsel fail to adequately impeach Kendra with the documentary evidence, but defense counsel also told the jury that it only needed to look at three of the medical-document pages, effectively instructing the jury to also overlook any of the contradictory evidence. Accordingly, we conclude that defense counsel's performance fell outside the wide range of professionally competent assistance. See *id*.

Moreover, considering that: (1) this case came down to a credibility contest between defendant and Kendra, and (2) the overlooked medical-record evidence supported defendant's version of events and undermined Kendra's credibility, we conclude that defendant was prejudiced by defense counsel's errors. See *Strickland*, 466 US at 690; *Caballero*, 184 Mich App at 640. In other words, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694.[3]

Accordingly, we vacate defendant's convictions and sentences, reverse the trial court's denial of defendant's motion for a new trial, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kathleen A. Feeney
/s/ Kristina Robinson Garrett
/s/ Mariam S. Bazzi

---

[3] In light of this resolution, we decline to address the remaining instance of ineffective assistance of counsel raised in defendant's Standard 4 brief. See Administrative Order No. 2004-6, 471 Mich ci, cii, Standard 4 (2004).