*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

OTIS ALFONZO MOFFITT,

Defendant-Appellant.

UNPUBLISHED
January 18, 2024

No. 362499
Berrien Circuit Court
LC No. 2021-015800-FC

Before: REDFORD, P.J., and RIORDAN and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.250b(1)(b); and second-degree criminal sexual conduct (CSC-II), MCL 750.250c(1)(b). The trial court sentenced defendant to serve concurrent terms of 11 to 30 years' imprisonment for CSC-I and 5 to 15 years' imprisonment for CSC-II. We affirm.

## I. FACTUAL BACKGROUND

This case stems from the criminal sexual conduct perpetrated against JF, who was 14 years old at the time, by defendant, allegedly JF's biological father.[1] According to JF's mother, defendant was introduced as JF's father in June 2021. During the weeks leading up to the incident, JF spent time with defendant while her mother was at work.

The incident between defendant and JF occurred on August 8, 2021, following a cookout that defendant hosted at his house. After the cookout, JF's mother agreed to let JF stay the night at defendant's house. However, before arriving home, JF's mother had a change of heart and decided to have JF's grandmother pick up JF from defendant's house. When JF's mother called

---

[1] No legal avenues were pursued to establish defendant's paternity of JF because defendant refused to participate in a DNA test.

defendant, he did not answer. JF's mother testified that something inside her told her to turn around and go back to defendant's house. She did so.

JF testified that, after her mother left, she was alone with defendant outside having a conversation when defendant began kissing JF's lips and neck before he opened his car door, grabbed JF's shirt, and pulled her into the back seat of the car. JF testified that defendant got into the car on top of her, rubbed her inner thighs, took off her shorts and underwear, unbuckled and unzipped his pants, and began having sex with her. JF testified that she told defendant to get off of her three times, but he did not stop. According to JF, defendant finally stopped when her mother pulled open the car door.

JF's mother testified that she made her way to the backyard of defendant's house after not finding JF or defendant anywhere inside the house. It was dark outside, so JF's mother used the flashlight on her cell phone to scan the backyard for JF. When she shined the light toward defendant's car, she saw defendant on top of JF in the back seat of the car. JF testified that when her mother opened the car door and took in the scene, her mother was extremely angry and asked, "Are you doing this to your child?" Defendant responded that JF was not his child and that he could do whatever he wanted to her. JF's mother and JF both testified that defendant offered to pay her a lot of money to not call the police, but JF's mother called the police anyway. Four Berrien County Sheriff's officers were dispatched to defendant's address.

Road Patrol Deputy Codee Stanley, one of the officers dispatched to the scene, testified that after arriving he could tell that defendant was slightly intoxicated, and defendant indicated that he was JF's father. Defendant immediately told Deputy Stanley about a black journal in which he had written regarding an investigation that he worked on concerning JF's mother's abuse of JF. Deputy Stanley testified that defendant never explicitly stated that he did not assault JF, but he claimed that the allegation was a setup. Sergeant Ian Dodd, who worked for the Detective Bureau of the Berrien County Sheriff's Department, was also dispatched to defendant's house. He collected DNA evidence from defendant in the form of a buccal swab. After defendant was arrested, Sergeant Dodd interviewed him; defendant maintained that he was being set up by JF's mother, and he denied JF's allegation. Defendant told Sergeant Dodd that he was planning on reporting JF's mother to Children's Protective Services (CPS) regarding potential abuse of JF, which he documented in the black journal that he had told Deputy Stanley about at the scene. Defendant claimed that JF's mother somehow learned about this and, in retaliation, set up the rape allegation to prevent defendant from contacting CPS. Sergeant Dodd testified that he read the black journal, but nothing in it pertained to the day of the incident, which, in his opinion, rendered the journal irrelevant to this case. Sergeant Dodd also testified that, during his interview with defendant, defendant denied being JF's father. Defendant stated that he and JF's mother came to an agreement that he would serve as a father figure to JF, but he understood that he was not JF's biological father. Defendant also explained that he agreed to the arrangement with JF's mother because he wanted to be a positive influence for JF.

After defendant's arrest at the scene, Deputy Stanley escorted JF and JF's mother to Lakeland Niles Hospital to have JF examined and to collect a Sexual Assault Nurse Examiner (SANE) kit. Lindsay Nixon, a forensic nurse, performed an exam of JF and testified that JF disclosed that penile penetration occurred, forced restraint was used, she was fondled, and her clothing was removed during the incident. Nixon performed an examination of JF, which included

the collection of DNA via a buccal swab, perineal swab, perianal swab, and vaginal swab. Nixon stated that, after the DNA evidence was collected, she placed the swabs and JF's underwear in the SANE kit and handed it to Deputy Stanley. Deputy Stanley took the SANE kit to the Michigan State Police Crime Laboratory for testing.

Michelle Schmitt, a DNA analyst in the DNA Unit of the Michigan State Police Forensic Laboratory in Grand Rapids, conducted DNA testing on the swabs from JF and defendant's underwear, which were collected following his arrest. Schmitt testified that the swab from defendant's underwear had a DNA mixture, meaning that it originated from two people, one of whom was male. The total mixture of DNA that was detected on the swab from defendant's underwear was compared to JF's DNA profile which was created using the swabs from her SANE kit. Schmitt testified that, on the basis of the DNA results from the swab of defendant's underwear, it was approximately 710 octillion times more likely that the DNA mixture originated from JF and one unknown, unrelated contributor than if it originated from two unknown, unrelated contributors. This analysis, therefore, provided very strong support that JF contributed to the DNA mixture on the swab of defendant's underwear.

At the conclusion of trial, the jury returned a guilty verdict for both charges. Defendant now appeals.

## II. ANALYSIS

### A. *BRADY* VIOLATION

Defendant argues that the prosecution withheld material impeachment evidence that was subject to disclosure pursuant to *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Defendant identifies the material evidence as files from an investigation into a different man following JF's allegation against that man for criminal sexual conduct. Defendant notes that no charges were ever brought against the man following the investigation. Defendant contends that the investigation files could have been used to undermine JF's, and potentially JF's mother's, credibility, which would have been favorable to his case. We disagree.

We review "due process claims, such as allegations of a *Brady* violation, de novo." *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016) (quotation marks and citation omitted). However, because defendant failed to move in the trial court for a new trial or relief from judgment, this issue is not preserved for appellate review. *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005). Unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). To establish plain error, the defendant must show that "(1) an error occurred, (2) the error was 'plain'—i.e., clear or obvious, and (3) the error affected substantial rights—i.e., the outcome of the lower court proceedings was affected." *People v Cain*, 498 Mich 108, 116; 869 NW2d 829 (2015). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003).

Our Supreme Court has recognized and reiterated what the Supreme Court of the United States held in *Brady*, that "the suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2013) (quotation marks and citation omitted). Therefore, criminal defendants "have a due process right to obtain evidence in the possession of the prosecutor if it is favorable to the accused and material to guilt or punishment." *People v Stanaway*, 446 Mich 643, 666; 521 NW2d 557 (1994). To establish a *Brady* violation, a defendant must prove: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *Chenault*, 495 Mich at 155. The "defendant bears the burden of providing this Court with a record to verify the factual basis of any argument upon which reversal [might be] predicated." *People v Everett*, 318 Mich App 511, 523; 899 NW2d 94 (2017) (quotation marks and citation omitted).

Defendant asserts, without any concrete evidence of such, that the investigation files pertaining to the allegation against the other man constitute impeachment evidence. However, there is more than one explanation as to why criminal charges were never sought against the man. Defendant jumps to the conclusion that criminal charges were not brought because the allegation was false, but he presents us with no evidence to support this claim. Without any support for his contention that the investigation files in the other man's case contain impeachment evidence, he cannot show that the evidence is favorable to his defense. We are not persuaded that a *Brady* violation occurred. Defendant, therefore, has not met his burden of establishing plain error or right to relief.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was deprived of his Sixth Amendment right to effective assistance of counsel because his trial counsel failed to (1) investigate defendant's journal concerning alleged abuse of JF by her mother and grandmother, (2) investigate the chain of custody and handling conditions of the physical evidence in the case, (3) call a DNA expert to testify for the defense, and (4) obtain the mother's phone records to corroborate her story. We disagree.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review "a trial court's factual findings for clear error and review de novo questions of constitutional law." *People v Dendel*, 481 Mich 114, 124; 748 NW2d 859 (2008). When no evidentiary hearing on the defendant's ineffective assistance claim has been held, "there are no findings to which this Court must defer[.]" *People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589 (2012). In such cases, as in the instant case, we determine whether the defendant received ineffective assistance on the record alone. *Id*. "If the record does not contain sufficient detail to support defendant's ineffective assistance claim, then [defendant] has effectively waived the issue." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

Our Supreme Court has held that the test articulated in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), is appropriate for analyzing claims of ineffective assistance of counsel in Michigan. *People v Pickens*, 446 Mich 298, 318-320; 521 NW2d 797 (1994). Under *Strickland*, 466 US at 688, "establishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). "[T]o

demonstrate that counsel's performance was deficient, the defendant must show that it fell below an objective standard of reasonableness under prevailing professional norms." *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003). To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Randolph*, 502 Mich at 9 (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). Further, "[b]ecause the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Defendant first argues that trial counsel's failure to investigate the black journal that he used to detail instances of child abuse and neglect perpetrated against JF by several other people, including JF's mother, constituted ineffective assistance of counsel. We disagree.

Defendant fails to provide any proof that trial counsel did not investigate the entries made in defendant's journal. Defendant makes the conclusory assertion that trial counsel failed to conduct such an investigation, but there is no evidence presented corroborating this claim. Defendant, therefore, has failed to establish a factual predicate for his claim. Because of this, the merits of defendant's legal position need not be examined. *People v Hoag*, 460 Mich 1, 7 n 5; 594 NW2d 57 (1999).

Defendant next argues that defense counsel provided ineffective assistance by failing to cross-examine Sergeant Dodd regarding the chain of custody of defendant's underwear from the night of the incident. Defendant contends that, by failing to adequately cross-examine Sergeant Dodd or call another witness to testify about the details related to the removal, storage, and transport of defendant's underwear, defense counsel provided ineffective assistance. We disagree.

Contrary to defendant's argument on appeal, trial counsel did cross-examine Sergeant Dodd about the chain of custody of defendant's underwear. Trial counsel began cross-examination by asking Sergeant Dodd about the procedure that he followed in collecting defendant's underwear and transporting his underwear to the crime lab. Trial counsel also questioned Sergeant Dodd about all of defendant's clothing being originally packaged together in one bag before the underwear was packaged separately to be sent to the lab. However, when trial counsel began to question Sergeant Dodd about the possibility that DNA could have been left on defendant's shorts and transferred to his underwear while the clothing items were in the same bag, the prosecution objected on the grounds that it called for speculation and that Sergeant Dodd was not an expert witness. Therefore, trial counsel cross-examined Sergeant Dodd as much as possible pertaining to the chain of custody and handling of defendant's underwear. Trial counsel also cross-examined Schmitt, the prosecution's DNA expert, about the possibility of skin cell transfer if items are packaged together and the possibility that JF's DNA could have been present on defendant's person before the alleged sexual assault took place. Given trial counsel's effective cross-examination of these witnesses, it is unclear how her performance could be considered deficient.

Trial counsel questioned Sergeant Dodd about the handling of defendant's underwear and questioned Schmitt about the process of DNA transfer. In doing so, trial counsel presented a theory that JF's DNA presence on defendant's underwear occurred for some reason other than that he

sexually assaulted her. We cannot conclude that such questioning "fell below an objective standard of reasonableness under prevailing professional norms." *Riley*, 468 Mich at 140. Therefore, defendant has failed to establish that trial counsel's performance was deficient. Defendant's ineffective assistance of counsel claim, therefore, fails.

Defendant also argues that trial counsel provided ineffective assistance by failing to call a DNA expert for the defense. Specifically, defendant contends that a DNA expert could have prevented the prosecution from insinuating in its closing argument that the 710 octillion number presented by Schmitt related to the quantity of DNA material found on defendant's underwear. In its closing argument, the prosecution stated: "They found [JF's] DNA, a lot of DNA. A lot to the tune of 710 octillion chance of that." Defendant argues that trial counsel failed to object to this incorrect statement or set the record straight in her own closing argument. Defendant's trial counsel, however, rebutted the statement by the prosecution in her closing argument. Trial counsel stated, regarding the numbers presented by the prosecution's DNA expert, Schmitt, that: "It's not an amount. Neither one of these numbers are an amount of DNA. It's a ratio, it's not an amount." Therefore, contrary to defendant's assertion, trial counsel addressed the assertion made by the prosecution and clarified the matter for the jury's consideration.

As to trial counsel's decision to not call an expert witness on behalf of the defense, "[a]n attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). Defendant makes the conclusory statement that trial counsel's failure to call a DNA expert to testify regarding the removal, storage, handling, and transport of his underwear constituted ineffective assistance of counsel. Defendant fails, however, to adequately present an argument that trial counsel's failure to do so reasonably affected the outcome of his case. The jury was also presented with testimony by the prosecution's DNA expert about the possibility of DNA transfer. Defendant does not articulate what a DNA expert testifying on his behalf could have stated differently that would have rendered the outcome of his trial different. Defense counsel presented the jury the theory that JF's DNA present on defendant's underwear occurred for a reason other than sexual assault. We are not persuaded that trial counsel's failure to call an expert witness to testify as to this theory constituted ineffective assistance of counsel.

Defendant also argues that defense counsel's failure to investigate JF's mother's phone records to confirm her claim that she made two phone calls to defendant on the night of the incident constituted ineffective assistance of counsel. Defendant contends that, had an investigation yielded evidence that JF's mother did not call defendant, such evidence could have been used to undermine JF's mother's credibility and would have reasonably led to a different outcome at trial. We disagree.

A failure to conduct a reasonable investigation can amount to ineffective assistance. *People v Trakhtenberg*, 493 Mich 38, 51-55; 826 NW2d 136 (2012). However, defendant still bears the burden of establishing a factual predicate for his ineffective assistance of counsel claim. The record does not contain evidence regarding the extent of trial counsel's pretrial investigation into whether JF's mother's phone records could have aided the defense. Without such evidence, there is no basis for concluding that trial counsel's performance was deficient. Defendant, therefore, has failed to establish a necessary factual predicate to establish his claim of ineffective

assistance of counsel and the merits of defendant's legal position need not be examined. *Hoag*, 460 Mich at 7 n 5.

## C. AMENDED INFORMATION

Defendant argues that the trial court's final jury instructions effectively amended the information, which unfairly surprised defendant and violated his due-process right to prepare and mount a defense. We agree; however, we conclude that defendant is unable to establish a plain error that affected his substantial rights.

Generally, "[a] trial court's decision to grant or deny a motion to amend an information is reviewed for an abuse of discretion." *People v McGee*, 258 Mich App 683, 686-687; 672 NW2d 191 (2003). However, because defendant did not object to the trial court's addition of the household-member variable during final jury instructions, this issue is not preserved for appellate review. *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) (quotation marks omitted). Unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *Heft*, 299 Mich App at 78.

"The Due Process Clause of the Fourteenth Amendment mandates that a state's method for charging a crime give a defendant fair notice of the charge against the defendant, to permit the defendant to adequately prepare a defense." *People v Chapo*, 283 Mich App 360, 364; 770 NW2d 68 (2009). In Michigan, a prosecution must be based on an information or an indictment. *People v Manning*, 243 Mich App 615, 624; 624 NW2d 746 (2000). Once a defendant undergoes or waives a preliminary examination, the bindover authorizes the prosecution to file an information against the defendant in circuit court. *People v Hunt*, 442 Mich 359, 362-363; 501 NW2d 151 (1993). "A trial court may amend an information at any time before, during, or after a trial, as long as the amendment does not unfairly surprise or prejudice the defendant." *People v Perry*, 317 Mich App 589, 594; 895 NW2d 216 (2016). Unfair surprise can be established "by articulating how additional time to prepare would have benefited the defense." *Id*. An amendment may also prejudice the defendant through inadequate notice or an insufficient opportunity to defend. *McGee*, 258 Mich App at 688.

Defendant waived his preliminary examination and was bound over on the charges in the complaint. Count 1 in the complaint stated that defendant "did engage in sexual penetration, to-wit: penis/vagina, with a child who was at least 13 but less than 16 years of age, and the defendant was related to the victim by blood or affinity to the 4th degree; contrary to MCL 750.520b(1)(b)." Count 2 in the complaint stated that defendant "did engage in sexual contact with a child who was at least 13 but less than 16 years of age, and the defendant was related to the victim by blood or affinity to the 4th degree; contrary to MCL 750.520c(1)(b)." Although neither the complaint nor information make a specific statutory citation to the variable of both charges that requires defendant to be related to JF by blood or affinity to the fourth degree, MCL 750.520b(1)(b)(*ii*) and MCL 750.520c(1)(b)(*ii*), respectively, the language used in both documents clearly indicates that defendant was charged under those specific statutory citations. This conclusion is supported by the preliminary instructions that the trial court gave the jury regarding the elements of each offense, which included the element that JF is related to defendant by blood or by marriage. The preliminary instructions made no mention of the household-member element. In contrast to the complaint, information, and preliminary instructions, the final instructions to the jury stated that

the jury could find defendant guilty on both counts if it concluded that JF was related to defendant by blood or marriage *and/or* that, at the time of incident, defendant and JF were living in the same household.

This Court has held that, when a preliminary examination is held on the element or charge to be amended, "the defendant is not unfairly surprised or deprived of adequate notice or a sufficient opportunity to defend at trial." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). Notably, however, no preliminary examination was held in defendant's case, and he was bound over to the circuit court on the information in the complaint, which did not include the household-member element. Although the complaint and information cited MCL 750.520b(1)(b) and MCL 750.520c(1)(b) generally, both specifically noted that an element of the offense was that defendant was related to JF by blood or affinity to the fourth degree. Therefore, although the amendment to the information did not change the charges that defendant faced, it did supply the jury with two avenues under which it could find him guilty. Defendant presents a compelling argument that his trial strategy would have been different had he known that he needed to defend against two variables instead of just one. Defendant argues that, had he been timely notified of the prosecution's intent to prove that he was a member of the same household as JF, he would have called witnesses, such as his daughter and grandson, to testify as to the frequency of JF's presence at his house. Further, defendant contends that he could have obtained school records indicating JF's residence, and trial counsel could have engaged in more pointed cross-examination of the prosecution's witnesses concerning this element. Defendant has, therefore, shown that the trial court's amendment to the information resulted in unfair surprise. Generally, such unfair surprise would establish that the trial court's amending of the information was an abuse of discretion. However, because defendant failed to object to the addition of the household-member variable at trial, review of the issue is limited to plain error affecting substantial rights.

First, defendant must be able to show that an error occurred. See *Cain*, 498 Mich at 116. Because the trial court's amendment to the information caused unfair surprise in violation of MCR 6.112(H), an error occurred. Second, the error must have been plain, meaning that it was clear or obvious. See *id*. Given that defendant waived his preliminary examination and, therefore, was not put on notice that the prosecution intended to instruct the jury on the household-member variable, it is reasonable to conclude that it was clear that defendant would suffer from unfair surprise when the jury was instructed on the household-member variable. Lastly, defendant must show that this plain error affected his substantial rights, meaning that it affected the outcome of trial. See *id*. Defendant has failed to do so.

Although there is no way of knowing concretely whether the jury found defendant guilty on the basis of his blood relation to JF or that he and JF were members of the same household, the prosecution presented sufficient evidence at trial from which the jury could reasonably conclude that defendant was related to JF as her father. JF and JF's mother both testified that defendant was JF's father. JF's mother also testified that defendant refused to participate in a paternity test, despite the fact that she asked him to do so several times. Defendant told Deputy Stanley, one of the officers who interviewed defendant at the scene, that JF was supposedly his daughter. Defendant only flatly denied being JF's father to Sergeant Dodd to whom he explained that he and JF's mother came to an agreement that, despite the fact that he was not JF's biological father and had not previously had any contact with her, he would serve as a father figure for her. Defendant admitted to purchasing JF clothes and having her regularly stay over at this house. Although

defendant denied being JF's father, a reasonable jury could, based on the evidence presented at trial, conclude that he is JF's father. Evidence established that defendant took great interest in her life, allowed her to stay at his house, purchased things for her, and desired to be a positive influence for JF. From such evidence, the jury could reasonably infer that defendant was JF's biological father. Defendant, therefore, is not entitled to reversal on this ground.

Defendant secondarily argues that trial counsel's failure to object to the trial court's final jury instructions constituted ineffective assistance of counsel. As noted earlier, "establishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *Randolph*, 502 Mich at 9. Also discussed earlier, the trial court's final jury instructions that effectively amended the information caused unfair surprise to defendant, which violated MCR 6.112(H). By not objecting to the violation of a court rule, trial counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms." *Riley*, 468 Mich at 140. Therefore, defendant has established that trial counsel performed deficiently. Nevertheless, to be entitled to relief, defendant must also establish that trial counsel's deficient performance prejudiced him, i.e., but for counsel's conduct, the outcome of the proceedings would have been different. Defendant has failed to establish that there is a reasonable probability the outcome of the proceedings would have been different had the trial court not amended the information at the close of proofs. Therefore, defendant similarly cannot establish that a reasonable probability exists that, but for trial counsel's deficient performance, the outcome of the proceedings would have been different. Because the prosecution presented sufficient evidence from which a reasonable jury could find that defendant was JF's biological father, it is unlikely that the addition of the household-member variable affected the ultimate outcome in the case. Therefore, defendant cannot show that trial counsel failed to provide effective assistance.

Affirmed.

/s/ James Robert Redford
/s/ Michael J. Riordan
/s/ Kathleen A. Feeney